[No. H037850. Sixth Dist. Jan. 9, 2013.]

In re JAMES L. STEVENSON on Habeas Corpus.

Counsel

Michael A. Kresser, under appointment by the Court of Appeal, for Petitioner James L. Stevenson.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Anya M. Binsacca and Stacey D. Schesser, Deputy Attorneys General, for Respondent the People.

Opinion

ELIA, J.—Respondent Rick Hill, Warden at Folsom State Prison, appeals from the superior court's December 9, 2011 order granting inmate James L. Stevenson's petition for writ of habeas corpus and compelling the Board of Parole Hearings (Board) to provide petitioner a new parole consideration hearing.[1] Petitioner James L. Stevenson is currently serving an indeterminate life term for a 1998 conviction of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)).[2]

We reverse the court's order granting habeas corpus relief.

I

*Procedural History*

On May 20, 2011, James L. Stevenson filed a petition for writ of habeas corpus challenging the Board's June 17, 2010 denial of parole on the grounds that (1) the Board had found him unsuitable for parole without "some evidence" of current dangerousness and (2) the Board had "failed to provide a nexus or reasoning between the negative factors it found and its conclusion that petitioner is currently dangerous." In support of the first ground, the petition stated among other facts: "The Board claimed my risk assessments were negative, but they placed me in the low/moderate range for risk of violent recidivism, with any elevation beyond low risk being caused by historical factors as explained in the 2009 report." In support of the second ground, the petition stated among other facts: "The Board characterized petitioner's most recent psychological reports as negative, when both assessed petitioner's risk of further violence as low to moderate."

---

[1] This court granted respondent's petition for a writ of supersedeas, staying enforcement of the December 9, 2001 order until final determination of this appeal.

[2] All further statutory references are to the Penal Code unless otherwise stated.

The following documentary evidence was submitted in support of the petition: a transcript of the June 17, 2010 parole consideration hearing, Dr. Black's comprehensive risk assessment prepared for the Board, dated September 21, 2009, Dr. Lehrer's subsequent risk assessment prepared for the Board, dated May 20, 2010, and a superior court order, filed March 25, 2011, vacating a previous parole decision of the Board.[3]

The superior court issued an order to show cause (OSC), indicating that, in its "experience," an inmate's low to moderate risk of violence if released into the community "has often been based on predomina[nt]ly static factors." The court reasoned as follows: "Because every life term inmate will have static facts elevating his or her assessment over the average person's, it may be the case that 'moderate' essentially means average for the kind of risk being considered. If so, then 'moderate' may not be grounds to overcome the [Penal Code section] 3041 presumption that parole shall normally be set in the average case." The court then observed: "Because none of the above observations are evidence in this case, it will be necessary to receive declarations from experts, and references to academic materials, in order to evaluate the true significant of a 'Low to Moderate Risk' assessment such as Petitioner's."

Respondent filed a return, alleging, among other facts, that "the Board relied on various factors to deny parole, including Stevenson's past criminality, his history of drug and alcohol abuse and sales, his past and present mental state and attitude towards the crime, unfavorable psychological assessments, institutional disciplinary history, his fairly limited institutional programming, and, to some extent, his commitment offense." The return alleged that "some evidence in the record is probative of Stevenson's current risk to the public, and therefore, the Board's decision satisfies due process." He also averred that "the Board is vested with authority to weigh Stevenson's psychological risk assessments in determining his current dangerousness." It also denied that "the Board's decision was arbitrary, capricious, or contrary to law" and denied that the Board failed to provide a nexus between the factors upon which it relied and its conclusion that petitioner presents an unreasonable risk to public safety.

In support of the return, respondent filed an abstract of judgment of the 1997 commitment offense, the probation officer's report for sentencing on that offense, the life prisoner evaluations for the initial parole consideration hearing and subsequent parole consideration hearings, a rules violation report (RVR) charging defendant with destruction of state property in 2002 and the

---

[3] We take judicial notice of *In re Stevenson* (Jan. 25, 2012, H036813) (nonpub. opn.). (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) In that case, we reversed the superior court's March 25, 2011 order.

guilty finding, an RVR charging defendant with possession of a controlled substance in 2000 and the guilty finding, an RVR report charging defendant with improper conduct or excessive contact with his wife during a visit in 1999 and the guilty finding, documented custodial counseling (CDC form 128-A), a redacted comprehensive risk assessment for a different inmate (submitted to show the definitions presently being used by evaluators in their reports), and two professional articles regarding risk assessment.

Petitioner Stevenson filed a denial (traverse) to the return on October 27, 2011. Although the return admitted that the Board relied on various factors to deny parole, it alleged that none of the Board's reasons constituted some evidence of his current dangerousness. It alleged that the 2009 risk evaluation "erred by scoring him a 'moderate' risk on the LS/CMI, when he scored in the 15th percentile, and the instrument stated that a score below the 30th percentile reflects a low risk." It also alleged that "the HCR-20 is not relevant to him because it is normed on a population of involuntarily confined mental patients, to which he is dissimilar because he has no psychiatric history or serious mental disorder." It further averred that petitioner's moderate risk for violence based on the HCR-20 was due to the fact that half of the items considered were historical and "not subject to reduction despite the passage of time." The return stated that the Board's decision was arbitrary and capricious.

In support of the denial, he filed the declaration of Melvin Macomber, Ph.D., a psychologist, regarding CDCR psychological evaluations. Dr. Macomber stated that level of service (LS) inventories were developed to assess recidivism potential, not risk of future violence. He explained in his declaration that a "score of 15% of incarcerated offenders is in the low risk range" while a score of "30% to 70%" would be moderate. Dr. Macomber indicated that the use of the HCR-20 to determine potential for violence was inappropriate because the "normative sample was taken from psychiatric populations" and there were "absolutely no validation studies in the literature" for applying that assessment to life term inmates who have spent years in custody and are not part of that psychiatric population. In his view, petitioner's moderate risk of violence based on the HCR-20 is "irrelevant" and "meaningless" since he has no psychiatric history or current psychiatric problems and impliedly does not "resemble[] the normative population . . . ."

By order filed on December 9, 2011, the superior court granted the petition and directed the Board to provide petitioner Stevenson with "a new hearing, comporting with due process, within 100 days" of its order.

The court provided an extensive statement of decision, ultimately concluding that "the Board did not employ the appropriate analytical framework in

reaching its decision . . . ." It granted the petition and directed the Board to hold a new hearing that comported with due process within 100 days of its order.

Respondent filed a notice of appeal.

## II

*June 17, 2010 Parole Consideration Hearing and Decision*

### 1. *Hearing*

The presiding commissioner described the commitment offense for the record. As the victim was returning to his vehicle at almost midnight on November 22, 1997, he was approached by two men, petitioner and a man later identified as Sanders, wearing dark clothing and ski masks. Sanders shoved a semiautomatic weapon into the victim's rib cage and asked if he had any money. When the victim replied in the negative, petitioner reached into the victim's pocket and removed a wallet and a pager. Petitioner then asked the victim how many people were in his house and whether there was any money in the house. Although the victim said there was no money in the house, petitioner told the victim to take them to his residence and the victim was pushed toward the house.

As the group was walking down the sidewalk and approaching an intersection, a police car was observed proceeding southbound. Petitioner said that "the cops are coming" and turned and began walking away from the victim in a westbound direction. Sanders followed petitioner. Petitioner pulled off his mask and the victim saw petitioner's face. When both perpetrators ran northbound on another street, the victim entered his residence and notified authorities. Responding officers apprehended petitioner and Sanders in different locations.

Petitioner acknowledged that Sanders and he followed the victim from the Bay 101 card club. He stated that Sanders had a nine-millimeter gun and they were both wearing masks. Petitioner admitted moving the victim against his will but petitioner denied taking the victim to his residence. Petitioner claimed that he had seen someone looking out a window and had told the victim to move forward because he did not want someone seeing what was going on. He claimed that the victim was moved no more than five feet to an area behind bushes. Petitioner admitted when the police car came, he pulled off his mask, the victim saw his face, and he ran.

Petitioner then acknowledged that he had previously been convicted in 1996 of carrying a loaded firearm in public; he had served some time in

county jail and he had been placed on probation for 24 months. He explained that he had been carrying a nine-millimeter weapon, which he had purchased on the street, because he was selling drugs. Petitioner indicated that he had not successfully completed his probation and he was subsequently arrested while on probation.

Petitioner confirmed a brief personal history. He graduated from a Louisiana high school in 1988 and joined the Navy. He served for four years and was honorably discharged in 1992. At the time of discharge, petitioner was a stationary engineer at the weapons depot in Concord, California. His first wife, with whom he had a son, had convinced him not to reenlist. Petitioner then went to work for the post office.

Petitioner quit his postal job while he was going through a divorce from his first wife. He had started selling drugs in Oakland, California, for extra money and he left the job because the money from dealing drugs had gotten "better and better." This was the beginning of his criminal lifestyle.

Petitioner's preferred parole plan was to live with his mother in Alexandria, Louisiana. In California, petitioner had been accepted into a multiservice reentry program located in Oakland. Another alternative in California was the Another Chance program that provided an alcohol- and drug-free living environment in Oakland.

The support letters in petitioner's file included a letter from his mother indicating that she had an at-home nail salon business and also sold tamales. Petitioner's mother indicated that she could get petitioner a job in Louisiana, either onshore or offshore. There was a letter from a program called A Place to Start a New Beginning, which stated that petitioner had been accepted as a resident into the program, and a letter from Allied Fellowship Service, which stated that petitioner had been accepted into its reentry program. There was also a letter from petitioner's brother in Florida who intended to provide emotional and financial support. Lastly, there was a letter from the aunt of petitioner's present wife, asking on behalf of petitioner's second wife for petitioner to be paroled. Petitioner provided the panel with a June 2010 letter from his mother indicating that the family would pay for the cost of his housing.

The Board had also received a letter from the Santa Clara Police Department opposing petitioner's release on parole.

During the review period covering December 2008 to May 2010, petitioner's custody status at Folsom State Prison had been medium A. He had been assigned to the yard crew. There had been no disciplinary issues.

As to programming, in 2009, petitioner had completed courses in stress management, anger management, and victim awareness. Petitioner indicated that he had also completed a good parenting program more than a month before the hearing but he had not yet received a certificate. Petitioner had provided evidence of participating in AA (Alcoholics Anonymous), dated March 30, 2010. He had an exceptional work report from his work supervisor, dated May 18, 2010, stating that petitioner was a good worker and the most senior yard worker.

According to petitioner, he had completed six units at Coastline Community College during the previous semester. Due to limits on enrollment, petitioner indicated that he was not currently enrolled and he was required to wait until the following semester to enroll again. He told the panel that he had completed a total of nine units, or three courses, and needed another six units to graduate. The panel advised petitioner to add his transcripts to his central file to show his completed coursework.

Petitioner indicated that he was attending AA/NA (Narcotics Anonymous) meetings, but did not state how often. His main hobby was exercising. He said he was reading a lot of self-help books, but did not name or discuss them. A deputy commissioner advised petitioner to keep a list of the self-help books he read because otherwise no record existed to support his claim. Petitioner indicated that he was generally trying to stay to himself. He indicated that he was no longer participating in a veteran's group on Saturday or attending church on Sunday because he had visitors every weekend.

Petitioner was asked about his poor writeups when he participated in a vocational auto paint program in about 2000. Petitioner explained that he was then still using drugs, he was then still "smoking weed" and drinking "pruno." Petitioner completed a vocational small engine repair class in 2003.

A deputy commissioner noted that a psychologist had indicated that petitioner had issues with his kidnapping conviction. Dr. Black's September 2009 report had stated that petitioner believed his sentence was unfair because he never meant to kidnap or harm anyone. At the hearing, petitioner admitted that he had been angry about being convicted of kidnapping because he had "never meant to kidnap someone." But he now understood that, under the law, he had kidnapped someone. He said, "But I'm just mad at myself because I never meant to kidnap no one. You know, if I knew now what I knew then, none of this would have happened."

Petitioner answered affirmatively when asked whether he learned the 12 steps. He was responsive when asked how he had applied the fourth and 10th steps to his life. He expressed how difficult it was to be denied parole and

how a denial makes "[y]ou feel like you want to go back to drugs or you want to go back to drinking." Petitioner indicated the importance of God and said that to him "the power of prayer is every step."

Petitioner was asked about the triggers for his anger. He first stated that he never had anger issues but he had taken the program just to learn more. He then said his trigger was not having enough money and being able to afford the things he wanted to buy for his family or son. When asked how he recognized his triggers for anger, petitioner said he did not know how to answer that because he did not believe he "ever had an anger issue." He admitted that he may have had a lot of problems but anger was not one of his issues.

Petitioner had not received any serious writeups since November 2002. As to the disciplinary action for destruction of state property in 2002, defendant's explanation was that a line had been tied to the sprinkler in the cell and his "cellie" had jumped out of bed and accidently grabbed the line and triggered the sprinkler. He said that they had used the line to hang a sheet for their use of the restroom. As to the 2000 disciplinary action, petitioner admitted being found with black tar heroin. He also acknowledged a disciplinary action for excess contact with a visitor in 1999.

Documented counseling indicated that petitioner had to be warned about smoking in 2002 and he had "refused to strip out for a medical exam" in 2001. Petitioner could not recall a "128" (CDC form 128-A, custodial counseling chrono) for inappropriate behavior with a visitor on September 19, 1999.

Petitioner represented that he had been alcohol and drug free for almost 10 years. Petitioner indicated that he wished he could apologize to the victim and he said that he wished he could express to him how sorry he was.

At the parole hearing, petitioner acknowledged that, while his present wife was visiting him, a search of his wife's hotel room, executed pursuant to warrant, uncovered drugs. Petitioner stated two other females were staying in the room and asserted that his wife had never tried to bring drugs into prison.

Petitioner indicated that he planned to maintain his sobriety upon release by going to a halfway house where the main focus would be ensuring that he had a good sponsor and by being surrounded by friends and family that want him to stay drug and alcohol free. When petitioner's counsel asked what he would do if he has the desire to drink or smoke marijuana, petitioner said he would probably go to a meeting and he would talk to his sponsor.

The two psychological reports assessing risk, the 2009 report from Dr. Black and the 2010 report from Dr. Lehrer, were mentioned. Extensive portions of those reports were read into the record.

Dr. Black had described petitioner's substance abuse history beginning as a teen and indicated drug use was a factor in the commitment offense. Petitioner's demonstrated knowledge of AA/NA principles had been inadequate during their interview; petitioner had been able to describe only part of the first step and none of the remaining 12 steps. Petitioner had reported that he believed he no longer had an alcohol or drug problem and was not at any risk for relapse. Dr. Black's report indicated that petitioner's personal insight into his need for prolonged alcohol and substance abuse programming and a relapse prevention plan appeared questionable.

Although petitioner verbalized remorse during his interview with Dr. Black, he had also indicated that he only thinks about the victim and his life crime when he is being interviewed or going to a Board hearing. Otherwise, petitioner tries to forget his negative past. He indicated to Dr. Black that he did not believe his sentence was fair because he never meant to kidnap or harm anyone.

Dr. Black had used three instruments to assess risk of future violence: the Psychopathy Check List—Revised (PCL-R), the Historical—Clinical—Risk Management—20 (HCR-20), and the Level of Service/Case Management Inventory (LS/CMI). Petitioner's score on the PCL-R placed him in "the low range of the clinical constructive [sic] of psychopathy when compared to other male offenders." Petitioner's overall score on the HCR-20 placed in him in the moderate range for violent recidivism.

The deputy commissioner reading Dr. Black's report into the record acknowledged the HCR-20 was partially based upon static, historical factors but focused on the report's recitation of the current, dynamic factors. The report stated: "Mr. Stevenson does appear somewhat prone to impulsivity and negative attitudes given his history of his reported perception that his life crime sentence was unfair. He has not been fully responsive to the benefits of 12-Step programming (e.g., he used marijuana in 2000 and [in] the present interview his expressed knowledge of the "12-Step" principles was inadequate). Additionally, his insight into this [sic] need for a relapse prevention plan seems limited." The risk management items on the HCR-20 included exposure to new stressors and destablilizers that he would likely face if granted parole plus his incomplete parole plans.

According to Dr. Black, the third instrument, the LS/CMI, which is used to evaluate the risk of recidivism, put petitioner in the moderate risk category.

After weighing all of the data from available records, the clinical interview, and the risk assessment data, Dr. Black's overall assessment was that petitioner presented a "low to moderate risk for violence in the free community." Dr. Black's "risk concerns" included the nature of petitioner's life crime, his reported history of dealing crack cocaine at a daily profit of $700 to $800, his history of alcohol and drug abuse, his lack of a relapse plan, and his incomplete parole plans.

In Dr. Lehrer's opinion, petitioner's 2009 assertion, that the drugs did not belong to his wife, appeared to be a "rationalization" since petitioner did not know whether his statement was true. In addition, petitioner did not seem to recognize that his wife, by allowing herself to be in proximity to individuals who engaged in procriminal activities, exhibited questionable insight and judgment and made herself vulnerable to criminality.

Dr. Lehrer had stated that petitioner's parole planning indicated a mix of good and poor insight with regard to the stressors and destabilizing elements inherent in parole of a prisoner who has been incarcerated for a long time. Dr. Lehrer described his relapse plans were "generally well conceptualized" but identified areas needing further clarification. These problematic areas included "potential issues regarding his wife's vulnerability to substance abuse and the level of involvement (if any) the inmate should have with friends of his wife," especially "since one of his job offers is from a friend of his wife." In Dr. Lehrer's opinion, petitioner's prognosis for parole appeared guarded. The prognosis was "pending further development of the inmate's ability to continue to clarify issues regarding how he should best ascertain the degree of contact with his wife or anyone associated with her while on parole."

Dr. Lehrer had indicated several salient dynamic risk factors potentially aggravating his risk to violently reoffend. It noted his only recent self-help programming other than his AA/NA attendance. Dr. Lehrer had concerns about petitioner's relationship with his wife, which were "further magnified by the inmate's pattern of perhaps too readily giving people another chance, or rationalizing regarding situations that might not be as safe as they need to be for his own security." According to Dr. Lehrer: "Errors [in] judgment might potentially place him in too easy proximity to pro-criminality [sic]. Given these factors, inmate Stevenson, being able to demonstrate stable programming, using what he learned from AA/NA in connection with self-help programming and developing a comprehensive approach to understanding the potential difficulties that might occur in interactions with his wife, or with his wife's friends, seem important to aid in lowering these dynamic risk factors."

When given an opportunity to make any closing statements, petitioner had little to say. Petitioner said he was ready for parole, the CDC would never have to worry about him again, and he prayed that the panel would give him a chance.

## 2. Decision

The Board determined that petitioner was not yet suitable for parole because he posed an unreasonable risk of danger if released from prison. The presiding commissioner stated that the finding of unsuitability was "based on weighing the considerations provided in the California Code of Regulation[s]." He stated that the panel had considered the commitment offense and given it the "appropriate weight" although it was not its "first consideration." It was noted that "the offense was carried out in a very dispassionate and calculated manner." The petitioner had been "lying in wait up at the card room, the victim was followed and again confronted when he left his vehicle." It was also significant that petitioner was on probation for a prior weapons offense at the time of the commitment offense and he had failed to profit from county jail time and adult probation. The panel thought that petitioner, by again mentioning that he had no intent to kidnap, was engaging in "a certain degree of minimization."

The panel indicated that it had considered the two psychological reports, the September 2009 report from Dr. Black and the 2010 report from Dr. Lehrer, which were described as unfavorable. It concluded that those risk assessments "represent[ed] some evidence to this Panel as to [petitioner's] current and unreasonable risk or danger to society."

The panel also considered petitioner's misconduct while incarcerated, including the three 115's, the most recent for destruction of state property in 2002, and the six 128's, the most recent for smoking in 2002.

It also considered petitioner's limited programming. The panel credited him for his progress in 2009 but believed there was a need for greater self-help programming. He had not adequately demonstrated that he had learned to identify his personal triggers of anger from the anger management course that he had taken.

On the positive side, the panel concluded that his parole plans were sufficient. It also recognized his participation in Coastline College, his yard crew reports, his recent participation in self-help, his discipline-free record since 2002, his past "vocational achievement of small engine repair," and his lack of juvenile assaultive history.

Although commending petitioner for his positive progress, the panel concluded that on balance he was not yet suitable for parole because he posed

a current and unreasonable risk of danger if released and required at least an additional three years of incarceration. Petitioner was advised to "[t]ake to heart the comments regarding participation in self-help." He was encouraged to prepare a closing statement before coming to the next hearing and told to keep his parole plans updated.

## III

### Discussion

#### A Habeas Corpus Proceedings

As a threshold matter, we first reiterate the law governing habeas corpus proceedings because, as we will discuss below, the superior court misconceives its authority.

#### 1. Governing Law

"To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus must be made by petition . . . ." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) "The petition should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. [Citations.]" (*Ibid.*)

"When presented with a petition for a writ of habeas corpus, a court must first determine whether the petition states a prima facie case for relief—that is, whether it states facts that, if true, entitle the petitioner to relief—and also whether the stated claims are for any reason procedurally barred. (*In re Clark* (1993) 5 Cal.4th 750, 769, fn. 9 [21 Cal.Rptr.2d 509, 855 P.2d 729].)" (*People v. Romero* (1994) 8 Cal.4th 728, 737 [35 Cal.Rptr.2d 270, 883 P.2d 388].) If the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an OSC. (*People v. Duvall, supra,* 9 Cal.4th at p. 475.) "When an order to show cause does issue, it is limited to the claims raised in the petition and the factual bases for those claims alleged in the petition. It directs the respondent to address only those issues." (*In re Clark, supra,* 5 Cal.4th at p. 781, fn. 16.) "Issuance of an OSC . . . indicates the issuing court's *preliminary assessment* that the petitioner would be entitled to relief if his factual allegations are proved." (*People v. Duvall, supra,* 9 Cal.4th at p. 475.)

"The factual allegations of a return must . . . respond to the allegations of the petition that form the basis of the petitioner's claim that the confinement

is unlawful. (*Romero, supra*, 8 Cal.4th at p. 738; *People v. Pacini* (1981) 120 Cal.App.3d 877, 884 [174 Cal.Rptr. 820].)" (*People v. Duvall, supra*, 9 Cal.4th at p. 476, fn. omitted.) "In addition to stating facts, the return should also, 'where appropriate, . . . provide such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.' ([*In re*] *Lewallen* [(1979)] 23 Cal.3d [274,] 278, fn. 2 [152 Cal.Rptr. 528, 590 P.2d 383].)" (*Ibid.*)

The petitioner's response to the return is "commonly known as the traverse" and "may incorporate the allegations of the petition. (*In re Lewallen, supra*, 23 Cal.3d 274, 277.)" (*People v. Romero, supra*, 8 Cal.4th at p. 739.) The traverse either admits or disputes the return's factual allegations. (*People v. Duvall, supra*, 9 Cal.4th at p. 477.) "Facts set forth in the return that are not disputed in the traverse are deemed true. ([*In re*] *Lawler* [(1979)] 23 Cal.3d [190,] 194 [151 Cal.Rptr. 833, 588 P.2d 1257].)" (*Ibid.*) "While the [petitioner's] traverse may allege additional facts in support of the claim on which an order to show cause has issued, *attempts to introduce additional claims or wholly different factual bases for those claims in a traverse do not expand the scope of the proceeding* which is limited to the claims which the court initially determined stated a prima facie case for relief. [Citations.]" (*In re Clark, supra*, 5 Cal.4th at p. 781, fn. 16, italics added.)

■ "[T]he well established rules of habeas corpus procedure provide no statutory or decisional authority that permits the superior court to issue an order to show cause that requires the respondent to address new claims not expressly or implicitly raised in the original habeas corpus petition or supported by the factual allegations in the original habeas corpus petition, unless those claims were raised by the petitioner in a supplemental or amended habeas corpus petition filed with the permission of the court." (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1237 [31 Cal.Rptr.3d 70], fn. omitted.) Consequently, a court exceeds its power by issuing an OSC that adds for consideration any claim not raised by the habeas corpus petition before the court. (*Id.* at p. 1239.) "To bring additional claims before the court, petitioner must obtain leave to file a supplemental petition for writ of habeas corpus. (*People v. Green* [(1980)] 27 Cal.3d [1,] 43, fn. 28 [164 Cal.Rptr. 1, 609 P.2d 468].)" (*Id.* at p. 1235.)

The interplay between the respondent's return and the petitioner's traverse "frames the issues the court must decide in order to resolve the case. [Citations.]" (*In re Serrano* (1995) 10 Cal.4th 447, 455 [41 Cal.Rptr.2d 695, 895 P.2d 936].) "Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely,

consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit, in which event the court may deny the petition without an evidentiary hearing. [Citations.] Finally, if the return and traverse reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing. (Pen. Code, § 1484.)" (*People v. Romero, supra,* 8 Cal.4th at pp. 739–740.)

■ "The various exhibits that may accompany the petition, return, and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference. (See *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 2 [275 Cal.Rptr. 384, 800 P.2d 862].) At the evidentiary hearing, such exhibits are subject to admission into evidence in accordance with generally applicable rules of evidence. (See *id.* at p. 1070.)" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 675 [128 Cal.Rptr.2d 104, 59 P.3d 174].) Following an evidentiary hearing, "the court in which the return has been filed will then either grant or deny relief based upon the law and the facts as so determined." (*People v. Romero, supra,* 8 Cal.4th at p. 740.)

"When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, . . . the question presented on appeal is a question of law, which the appellate court reviews de novo. (*In re Zepeda* (2006) 141 Cal.App.4th 1493, 1497 [47 Cal.Rptr.3d 172].)" (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192 [92 Cal.Rptr.3d 36].) Similarly, when a trial court makes findings "based solely upon documentary evidence, we independently review the record. (*In re Serrano, supra,* 10 Cal.4th at p. 457.)" (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

In this case, we "review the trial court's decision and the contentions of the parties in light of the materials that properly were before that court." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.) "We presume that the trial court accepted as true petitioner's undisputed factual allegations, including any undisputed matters contained in the exhibits incorporated by reference into his pleadings. (See *In re Serrano, supra,* 10 Cal.4th at p. 457; *In re Fields, supra,* 51 Cal.3d at p. 1070, fn. 2.)" (*Id.* at p. 676.)

## 2. *Order to Show Cause*

In this case, the superior court's order to show cause invited the parties to submit new evidence regarding the "true significance" of an assessment of "low to moderate" risk for violence. While the petition questioned the negative characterization of the psychological assessment that petitioner posed an overall "low to moderate" risk of violence if released into the community, it did not dispute the assessment's validity. The trial court

exceeded its authority by framing a new issue for consideration and indicating it would "receive declarations from experts" and "references to academic materials." (See *Board of Prison Terms v. Superior Court, supra,* 130 Cal.App.4th at p. 1237.) Petitioner has not cited, and we have not found, any authority allowing a court, which is reviewing a parole decision denying parole, to grant habeas corpus relief based upon evidence not presented to the board. (Cf. *In re Hardy* (2007) 41 Cal.4th 977, 1016 [63 Cal.Rptr.3d 845, 163 P.3d 853] ["Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates a prisoner is actually innocent."]; *In re Clark, supra,* 5 Cal.4th at p. 766 [newly discovered evidence is not a basis for habeas corpus relief where it merely might have weakened the prosecution's case or presented a more difficult question for the trier of fact].)

### 3. *Order Granting Habeas Corpus Relief*

The habeas corpus petition raised only two grounds for relief: (1) the lack of "some evidence" of current dangerousness and (2) the lack of a rational nexus between the unsuitability factors named by the Board and its determination of current dangerousness. The petition did not allege that the Board's decisional process was procedurally flawed. To the extent that the superior court resolved issues not explicitly or implicitly raised by the habeas corpus petition, the court exceeded its authority. (See *Board of Prison Terms v. Superior Court, supra,* 130 Cal.App.4th at pp. 1235, 1237; *In re Clark, supra,* 5 Cal.4th at p. 781, fn. 16.)

### B. *Court's Stated Reasons for Granting Habeas Corpus Relief*

None of the superior court's reasons for granting habeas corpus relief withstand scrutiny.

### 1. *Assessed Risk of Violence*

The panel's decision rested in part on the two psychological reports, which assessed petitioner's risk for future violence.

The superior court found that the panel had erred by relying upon the petitioner's assessed "low to moderate" risk for violence in determining that he was not yet suitable for parole. The court stated: "The recent case of *In re Lira* (2011) . . . (H036162) has resolved one of the central issues this case presented. The Sixth District has recently recognized that a risk assessment of 'moderate,' which is 'elevated above low only because of immutable historical facts,' [citation] does not independently or in and of itself supply 'some evidence' in support of a parole denial. Just as the static facts of the crime

itself do not have independent weight without a nexus, so too a psychologist's 'moderate' finding based on static factors needs a nexus 'to remain probative of current dangerousness.' [Citation.]"

The *Lira* decision is no longer citable authority.[4] (Cal. Rules of Court, rules 8.1105(e)(1), 8.1115.) In any event, the transverse did not allege sufficient facts, which if true, established that Dr. Black elevated petitioner's overall risk for violence above "low" based upon *only* immutable historical facts or that the panel's decision turned on such a risk assessment.[5]

## 2. *Weighing Factors*

In its decision denying parole, the panel made the following introductory remarks: "[T]he Panel has reviewed . . . all relevant information that was before us today in concluding that you are not yet suitable for parole because you currently pose an unreasonable risk of danger if released from prison. The finding of unsuitability is based on weighing the considerations provided in the California Code of Regulation[s]." The superior court concluded that the panel's remark regarding "weighing" established that it had improperly weighed those "factors against hypothetical minimum elements [(fn. omitted)]" and had improperly given the factors "independent weight."[6]

■ We begin with the statutory presumption that "official duty has been regularly performed" (Evid. Code, § 664), which may be rebutted and affects the burden of proof (Evid. Code, § 660). This presumption applies to parole

---

[4] This court granted rehearing and then issued a new opinion in *People v. Lira* (Dec. 6, 2011, H036162). The matter is now pending before the California Supreme Court. (*In re Lira*, review granted Oct. 17, 2012, S204582.)

[5] While Dr. Black recognized that petitioner's score on the HCR-20 was "not amenable to significant change" since most of the data relied upon was historical, that score was not the only basis for his overall assessment of risk.

[6] It is not clear what the superior court meant by "*hypothetical* minimum elements." In *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], the Supreme Court stated: "When the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence" of aggravating facts *beyond the minimum elements of that offense.* (*Rosenkrantz, supra,* 29 Cal.4th 616, 658, 683.)" (*Id.* at p. 1095, fn. 16.) In *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535], the Supreme Court abandoned the "minimum elements" test, finding that it had "proved in practice to be unworkable." (*Id.* at pp. 1213–1214.) It held that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." (*Id.* at p. 1221.) "[T]he Board may not base its assessment of current dangerousness upon the existence or nonexistence of a suitability factor, but instead must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the full record. (*Id.* at p. 1221.)" (*In re Prather* (2010) 50 Cal.4th 238, 255 [112 Cal.Rptr.3d 291, 234 P.3d 541].)

suitability decisions. (See *In re McClendon* (2003) 113 Cal.App.4th 315, 323 [6 Cal.Rptr.3d 278]; *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1478 [8 Cal.Rptr.2d 492].) The panel's "weighing" statement, which was taken out of the context of the entire decision, together with the panel's other statements concerning weighing, do not affirmatively overcome this presumption since the Board, under applicable statutes and regulations, must consider and weigh all relevant circumstances in evaluating an inmate's suitability for parole.

■ The Board is statutorily required to "establish criteria for the setting of parole release dates . . . ." (§ 3041, subd. (a).) California Code of Regulations, title 15, section 2281 sets forth the factors to be considered by the Board in assessing whether a life prisoner is suitable for parole or poses "an unreasonable risk of danger to society if released from prison."[7] (See *In re*

---

[7] Subdivision (b) of section 2281 of title 15 of the California Code of Regulations provides: "*All relevant, reliable information available to the panel shall be considered in determining suitability for parole.* Such information shall include the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and *any other information which bears on the prisoner's suitability for release.* Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Italics added.) Subdivision (c) of section 2281 of title 15 of the California Code of Regulations states: "The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; *the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.* Circumstances tending to indicate unsuitability include: [¶] (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense. [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. [¶] (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense. [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (Italics added.) Subdivision (d) of section 2281 of title 15 of the California Code Regulations provides: "The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; *the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.* Circumstances tending to indicate suitability include: [¶] (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History.

*Lawrence, supra,* 44 Cal.4th at pp. 1202–1203; see also § 3041, subd. (b) ["The panel or the board, sitting en banc, shall set a release date unless it determines . . . that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ."].) The Board and the Governor are authorized to "identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.' (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.)" (*In re Lawrence, supra,* 44 Cal.4th at pp. 1205–1206.) "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board and] the Governor." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677; see *In re Prather, supra,* 50 Cal.4th at p. 257, fn. 12 ["The Governor has the authority to weigh suitability factors differently from the Board . . . ."].) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677; see *In re Shaputis* (2008) 44 Cal.4th 1241, 1260–1261 [82 Cal.Rptr.3d 213, 190 P.3d 573].)

Thus, the panel was entitled to consider and weigh the circumstances relevant to petitioner's parole suitability. The record does not affirmatively establish that the panel, in reaching its decision to deny parole, merely weighed unsuitability and suitability factors against each other in a vacuum or failed to base its decision on the "overarching consideration" of public safety. (*In re Lawrence, supra,* 44 Cal.4th at p. 1209.) The superior court myopically focused on the weighing remark, improperly speculating regarding its significance. (See *In re Shaputis* (2011) 53 Cal.4th 192, 218 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*) ["considerations of judicial restraint and comity between the executive and judicial branches counsel against including mere suspicions in the court's opinion"].)

In addition, the superior court assigned error to the panel's statement that it had given the commitment offense "appropriate weight" on the ground that "a

The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time. [¶] (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization. [¶] (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Italics added.)

court is unable to meaningfully review a vague finding of 'appropriate weight.' " The habeas corpus petition did not claim that the Board's statement of decision did not allow meaningful judicial review or meet the minimal standards of procedural due process.

"Because the petitioner has the evidentiary burden, it is the petitioner who must select the claims that the petitioner desires to plead and prove as the grounds for habeas corpus relief." (*Board of Prison Terms v. Superior Court, supra,* 130 Cal.App.4th at p. 1236.) The superior court did not invite petitioner to amend his habeas corpus petition or file a supplemental petition raising such claims. (See *id.* at p. 1239 [recognizing that "the superior court has the authority to invite amended or supplemental habeas corpus petitions in the interests of justice"].) Consequently, the superior court exceeded the scope of its authority by granting habeas corpus relief based upon the panel's "appropriate weight" remark. (See *id.* at pp. 1235, 1237; *In re Clark, supra,* 5 Cal.4th at p. 781, fn. 16.)

Furthermore, petitioner has not cited, and we are not aware of, any authority requiring the Board or the Governor to describe in its decision the exact or relative weight given any particular circumstance. "As long as the [parole suitability] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677; see *Shaputis II, supra,* 53 Cal.4th at p. 210; *In re Shaputis, supra,* 44 Cal.4th at pp. 1260–1261 (*Shaputis I*); *In re Lawrence, supra,* 44 Cal.4th at p. 1204.)

3. *Panel's Description of the Commitment Offense*

As indicated, in reaching its decision, the panel had "noted that the offense was carried out in a very dispassionate and calculated manner" in that petitioner was "lying in wait up at the card room, the victim was followed and again confronted when he left his vehicle." The panel had also "noted that the motive for this crime is very trivial in relationship to the offense."

The superior court faulted the panel for its characterization of the robbery, stating: "Kidnapping for robbery always involves a motive of monitary [*sic*] gain so for the instant panel to call the motive 'trivial in relation to the offense' demonstrates such a basic misunderstanding of their duties that the entirety of their 'findings' are suspect. Similarly, to call the crime 'dispassionate' and 'calculated' seems to reveal that the Board was following a script meant for murder cases instead [of] giving Petitioner individualized consideration." The court mentioned that the previous panel had concluded that the

offense was "not egregious and was 'not a consideration' " and then commented that the present panel's "diametrically opposite findings demonstrate how arbitrary and capricious the various panels can be."

 In suggesting that the Board was following "a script for murder cases" instead of considering petitioner's individual circumstances, the superior court improperly strayed into the area of prohibited speculation. (Cf. *Shaputis II, supra*, 53 Cal.4th at p. 217.) The applicable regulation indicates that the circumstances of the commitment crime may be relevant and the factors that properly may be considered include whether the "offense was carried out in a dispassionate and calculated manner" and whether the "motive for the crime is . . . very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2281, subds. (b), (c)(1)(B) & (E).)

The commitment offense was carried out in a dispassionate and calculated manner in the sense that it was planned and the perpetrators waited for each victim to exit the card room, followed the victim home, and then robbed the victim. It was neither an impulsive crime nor a crime of passion.

The record does not disclose what the panel meant by "trivial." Dr. Black's report, upon which the panel relied, revealed that petitioner had disclosed that, before the crime, he had approached two persons who he knew had been following casino patrons and then robbing them because petitioner wanted to take part in that scheme. Petitioner had explained that he "wanted to take part in their robbery scheme because he had recently been robbed himself." The panel could reasonably conclude that petitioner had a petty motive in that petitioner wanted to rob another person because petitioner had been recently robbed and was indifferent to his victim's suffering. While it does not appear petitioner committed the kidnapping for robbery "in an especially heinous, atrocious, or cruel manner" (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)), the present panel never concluded that his commitment offense was an egregious kidnapping for robbery.

Neither the present panel's description of the commitment offense nor a comparison of the present panel's and past panel's descriptions of that offense establish that the Board's decision to deny parole was arbitrary. Each parole suitability hearing is a "de novo hearing" and the Board is not bound by previous findings and conclusions. (§ 3041.5, subd. (c).)

As recognized by the Supreme Court, the parole suitability decision involves subjective analysis. (*Shaputis II, supra*, 53 Cal.4th at p. 219 ["[I]t has long been recognized that a parole suitability decision is an 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' "].) The role of the

courts is to "consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. (*Id.* at p. 1221.)" (*Ibid.*)

The superior court erred in granting habeas corpus relief based on the panel's characterization of the commitment offense.

### 4. Use of "Some Evidence" Language

In the decision, petitioner was told that the risk assessments of Drs. Black and Lehrer "represent some evidence to this Panel as to your current and unreasonable risk of danger to society." The superior court found the panel's statement "particularly troubling because 'some evidence' is the highly deferential standard of review" used for judicial review and the "Board should not see its role as being to mine the record before it for such a low threshold as 'some evidence' to base a parole denial upon."

The court below once again veered off into prohibited speculation. (Cf. *Shaputis II, supra,* 53 Cal.4th at p. 217.) There is nothing in the panel's decision demonstrating that the panel was using the phrase "some evidence" as a legal term of art for the purpose of directing any future reviewing court to the minimal evidence required to uphold its decision. In the absence of clear evidence to the contrary, courts must presume that the panel was not shirking its legal responsibility to exercise its discretion. (See Evid. Code, § 664.)

### 5. Alleged Failure of Panel to Adequately Explain Its Reasoning

The Supreme Court has stated that the "some evidence" standard is "unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*In re Lawrence, supra,* 44 Cal.4th at p. 1210.) The critical issue is "how those factors interrelate to support a conclusion of current dangerousness to the public." (*Id.* at p. 1212.) For example, the "mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Id.* at p. 1227.)

In granting habeas corpus relief, the superior court stated that "in the review of broadly discretionary decisions due process requires examination of the reasoning given not the result achieved. [Citations.]" It indicated that the Board had not "formulated the reasoning, and nexus . . . ."

A court reviewing a parole decision determines "whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1212.) The California Supreme Court has most recently made clear that "nothing in the requirement that a parole denial be accompanied by a 'statement of . . . reasons' demands that the parole authority comprehensively marshal the evidentiary support for its reasons. (*In re Sturm* (1974) 11 Cal.3d 258, 272 [113 Cal.Rptr. 361, 521 P.2d 97].)" (*Shaputis II, supra,* 53 Cal.4th at p. 214, fn. 11.)

While the panel did not lay out its every inference and all supporting evidence in support of its decision, the panel's decision was accompanied by a statement of reasons for finding petitioner dangerous and denying parole. (See *In re Sturm, supra,* 11 Cal.3d at pp. 270, 272–273 [due process requires a definitive written statement of the reasons for denying parole].) The record does not reflect that the Board merely engaged in a "rote recitation" of factors.

We now turn to the claims actually raised by the petition, which are both subsumed in the "some evidence" standard of review.

## C. *Board's Parole Unsuitability Decision*

### 1. *California's "Some Evidence" Standard*

The California Supreme Court clarified the courts' role in reviewing parole suitability decisions in its recent opinion in *Shaputis II, supra,* 53 Cal.4th 192. "The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety." (*Id.* at p. 220.) The Board or the Governor draws the answers to that question "from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Id.* at p. 221.) "The inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration" (*Id.* at p. 219.) The Board and the Governor may consider "the inmate's understanding of the crime and the reasons it occurred, or the inmate's insight into other aspects of his or her personal history relating to future criminality." (*Id.* at p. 220.) As indicated, "a parole suitability decision is an 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' (*Rosenkrantz, supra,* 29 Cal.4th at p. 655; see *In re Sturm, supra,* 11 Cal.3d at p. 266.)" (*Id.* at p. 219.)

"Judicial review is conducted under the highly deferential 'some evidence' standard."[8] (*Shaputis II, supra,* 53 Cal.App.4th at p. 221.) "The 'some evidence' standard is intended to guard against arbitrary parole decisions, without encroaching on the broad authority granted to the Board and the Governor. (*Lawrence, supra,* 44 Cal.4th at pp. 1204–1205, 1212; *Rosenkrantz, supra,* 29 Cal.4th at pp. 664–665.)" (*Id.* at p. 215.) "The court reviews the entire record to determine whether *a modicum of evidence* supports the parole suitability decision." (*Id.* at p. 221, italics added.) "[C]ourts consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. [Citation.]" (*Id.* at p. 219.)

The "some evidence" standard of review does not equate to the more demanding "substantial evidence" standard of review. (*Shaputis II, supra,* 53 Cal.4th at p. 214.) But similar to a court reviewing the substantiality of the evidence, a court reviewing a parole unsuitability determination by the Board or the Governor "must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. (Cf. *Jackson v. Virginia* (1979) 443 U.S. 307, 318–320 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738] . . . .)" (*Ibid.*) "The court is not empowered to reweigh the evidence." (*Id.* at p. 221.) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

"Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard. (See *Jackson, supra,* at p. 320 [99 S.Ct. 2781].)" (*Shaputis II, supra,* 53 Cal.4th at p. 214, fn. omitted.) Moreover, a court's deferential "some evidence" review is not

---

[8] The right of due process under California's Constitution requires "some evidence" to support a parole authority's decision to deny parole. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 658.) But "California's 'some evidence' rule" is not "a substantive federal requirement." (*Swarthout v. Cooke* (2011) 562 U.S. ___, ___ [178 L.Ed.2d 732, 131 S.Ct. 859, 862].) The U.S. Supreme Court has recognized that when a state creates a liberty interest in receiving parole when state standards are met, as California has done, "the Due Process Clause requires fair procedures for its vindication." (*Ibid.*) But those minimal procedural safeguards include only "an opportunity to be heard" and "a statement of the reasons why parole was denied" as the court had previously held in *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 16 [60 L.Ed.2d 668, 99 S.Ct. 2100] (*Greenholtz*). (*Swarthout v. Cooke, supra,* 562 U.S. at p. ___ [131 S.Ct. at p. 862].) In *Greenholtz,* the U.S. Supreme Court recognized that the decision to grant parole "is more subtle [than the parole-revocation decision] and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release." (*Greenholtz, supra,* 442 U.S. at pp. 9–10.)

limited to the evidence mentioned by the Board or the Governor. (*Id.* at p. 214, fn. 11.) "Only when the evidence reflecting the inmate's present risk to public safety leads to but *one conclusion* may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process. [Citation.]" (*Id.* at p. 211, italics added.)

In his concurring opinion in *Shaputis II*, Justice Liu cited the Sixth District's opinion of *In re Ryner* (2011) 196 Cal.App.4th 533 [126 Cal.Rptr.3d 380], which predated *Shaputis II* and questioned the use of insight as a factor in parole suitability decisions. (See *Shaputis II, supra,* 53 Cal.4th at pp. 227–228, 229.) The majority of the Supreme Court did not embrace *Ryner*'s reasoning or the limitation suggested.[9] *Shaputis II* stated that the Supreme Court had "expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]" (*Shaputis II,* at p. 218.) It clarified that "the inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration." (*Id.* at p. 219.) The court also recognized that an "inmate's insight into other aspects of his or her personal history relating to future criminality" could be relevant to a parole suitability decision. (*Id.* at p. 220.)

In a footnote in *Shaputis II*, the majority made plain that it did not agree with Justice Liu: "Our concurring colleague suggests that 'some evidence' review is restricted to evidence actually relied upon by the Board or the Governor. (Conc. opn. of Liu, J., *post* . . . .) However, nothing in the requirement that a parole denial be accompanied by a 'statement of . . . reasons' demands that the parole authority comprehensively marshal the evidentiary support for its reasons. [Citation.] It is axiomatic that appellate review for sufficiency of the evidence extends to the entire record, and is not limited to facts mentioned in a trial court's statement of decision, for instance. [Citations.]" (*Shaputis II, supra,* 53 Cal.4th at pp. 214–215, fn. 11.)

At the end of *Shaputis II*, the court summarized the principles governing review of parole decisions. (*Shaputis II, supra,* 53 Cal.4th at pp. 220–221.)

---

[9] In *Ryner,* this court questioned "whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct" and "whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone." (*In re Ryner, supra,* 196 Cal.App.4th at p. 548.) We considered "the very concept of 'insight' to be inherently vague" and found that "whether a person has or lacks insight is often in the eye of the beholder." (*Ibid.*) We indicated that "[e]vidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime." (*Ibid.*, fn. omitted.)

The court stated that the "essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety" and that "question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Id.* at pp. 220–221.) The court reiterated: "Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision." (*Id.* at p. 221.) It stressed: "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between *the evidence* and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Id.* at p. 221, italics added.)

■ We accept the majority's decision and our review in this case is governed by the court's opinion in *Shaputis II*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."].)

2. *Application of the "Some Evidence" Standard of Review*

We are aware that both Dr. Lehrer's 2010 psychological report and the panel's decision commended petitioner for his progress toward parole suitability. We also applaud his efforts toward rehabilitation. We make the unremarkable, commonsense observation that as an inmate works toward the goal of parole release, suitability for parole may become a closer and closer question for the Board or Governor. A court reviewing a parole decision must keep firmly in mind the legal constraints of judicial review and not substitute its judgment for a parole authority's judgment with which it might disagree.

In *Shaputis II*, the Supreme Court stressed the differing roles of a parole authority and the courts: "It bears emphasis that while 'subjective analysis' is an inherent aspect of the parole suitability determination, it plays a proper role only in the *parole authority's* determination. [Citation.] The courts' function is one of objective review, limited to ensuring that the Board's or Governor's analysis of the public safety risk entailed in a grant of parole is based on· a modicum of evidence, not mere guesswork. [Citation.] It is the parole authority's duty to conduct an individualized inquiry into the inmate's suitability for parole. [Citation.] The courts consider only whether some

evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. [Citation.]" (*Shaputis II, supra,* 53 Cal.4th at p. 219, fn. omitted.)

■ Here, the panel concluded that petitioner was still engaging in some degree of minimization of the commitment offense. While petitioner may not have intended to commit a kidnapping in the layperson's sense and he now understands that he nevertheless committed kidnapping under the law, his comments still may be regarded as downplaying and not fully confronting the gravity of the criminal misconduct that he intended and carried out. "Past criminal conduct and current attitudes toward that conduct may both be significant predictors of an inmate's future behavior should parole be granted. (*Lawrence, supra,* 44 Cal.4th at p. 1213; *Shaputis I, supra,* 44 Cal.4th at pp. 1259–1260.)" (*Shaputis II, supra,* 53 Cal.4th at p. 219.) Even if this court might not have drawn that inference, we cannot say that it was irrational. In any case, it does not appear that the panel put primary weight on this inference.

■ The panel indicated that it was relying upon the two most recent psychological risk assessments, which placed petitioner at a low-to-moderate risk for future violence.[10] Both reports expressed concerns about certain dynamic factors. The importance of an adequate relapse plan was evident since the psychological reports indicated petitioner had a long history of alcohol and drug abuse, he had decided to abruptly quit his postal job to focus on selling illegal drugs, he sold crack cocaine for months before the commitment offense, drug use was a factor in the commitment offense, petitioner continued substance abuse for some time while in prison, and he had been diagnosed with alcohol abuse and cannabis abuse. Dr. Lehrer indicated that petitioner's substance abuse relapse plan was still deficient, which increased his risk.

When petitioner had the opportunity to speak to the panel, petitioner did not demonstrate that he had addressed the identified shortcomings in his

---

[10] We are aware that Dr. Macomber's declaration, which was submitted with petitioner's denial (traverse), discussed the various risk assessments used by Dr. Black and their inappropriateness as predictive tools and stated that a score of 15 percent on the level of service inventories actually fell in the low, rather than the moderate, range for risk of recidivism. It is not the courts' function "to weigh conflicting views in the social or psychological sciences." (*Shaputis II, supra,* 53 Cal.4th at p. 220.) In any case, the superior court did not determine that habeas corpus relief depended upon the resolution of any disputed fact, did not hold an evidentiary hearing, and did not make any factual findings. Furthermore, as indicated above, "a habeas corpus petitioner may not raise additional issues in the traverse." (*Board of Prison Terms v. Superior Court, supra,* 130 Cal.App.4th at p. 1235; see *In re Clark, supra,* 5 Cal.4th at p. 781, fn. 16.) Obviously, if a factual error appears in a report, an inmate should take care to voice any corrections at the parole hearing.

relapse plan. With respect to handling potential destabilizing situations with his wife or his wife's friends, petitioner was still implying at the hearing that the heroin found in his wife's motel room did not belong to her by stating that she had been staying with two other females and she had not been trying to bring drugs into prison. In his comments to the panel, petitioner did not answer Dr. Lehrer's concern that petitioner was rationalizing the situation and did not actually know that the drugs discovered did not belong to his wife. The psychologists' reports supported the Board's conclusion that petitioner was not yet suitable for parole.

 As indicated, Dr. Lehrer thought it was important for petitioner to demonstrate stable programming to decrease his risk of reoffending. A criterion tending to indicate suitability for parole is that "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2281, subd. (d)(9).) The panel concluded that petitioner had "programmed in a fairly limited manner." It found that petitioner had chosen not to take advantage of additional self-help programs that were available.

Although petitioner had been imprisoned since 1998, the psychological reports indicated that, aside from his AA/NA involvement, petitioner had only relatively recently completed a number of self-help programs. Petitioner had taken an anger management course but, at the hearing, he was unable to demonstrate what he had learned and he could not readily identify his personal triggers for anger. Anger may have played a role in his decision to rob someone since he had apparently committed the robbery in reaction to being robbed himself. He contradictorily admitted that he had felt angry about being convicted of kidnapping and denied having any issues with anger.

"[C]onsideration of an inmate's rehabilitation" is "an integral element of a parole suitability determination." (*In re Lawrence, supra*, 44 Cal.4th at p. 1220, fn. 19.) The extent of an inmate's insight is "a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. (*Lawrence*, at p. 1227; see also *Shaputis I*, at p. 1261, fn. 20.)" (*Shaputis II, supra*, 53 Cal.4th at p. 218.) The Board could reasonably conclude that petitioner had not yet fully developed the insight and coping skills necessary to "live in society without committing additional antisocial acts." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 655.) There was a rational nexus between the evidence and the panel's ultimate determination of current dangerousness; a modicum of evidence supports its decision to deny parole. This is not a case where a court is compelled to overturn the Board's decision because "the evidence reflecting the inmate's present risk to public safety

leads to but one conclusion" (*Shaputis II, supra*, 53 Cal.4th at p. 211), one contrary to the Board's decision. The "some evidence" standard is satisfied.

## DISPOSITION

The superior court's December 9, 2011 order granting the habeas corpus petition is reversed, and the matter is remanded to the superior court with directions to enter a new order denying the petition.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied January 30, 2013, and petitioner's petition for review by the Supreme Court was denied May 15, 2013, S209388.