Filed 3/26/14  In re Martinez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re RAY MARTINEZ, <br><br>      on Habeas Corpus. | H037374 <br> (Santa Clara County <br>  Super. Ct. No. 103876) |

## I.  INTRODUCTION

On October 9, 1985, Ray Martinez killed a neighbor, Michael Day, with one rifle shot at close range and wounded Ron Hargraves[1] with another rifle shot, leading to his convictions after a jury trial of first degree murder (Pen. Code, § 187)[2] and assault (§ 245), both involving the personal use of a rifle (§ 12022.5).[3]  On April 11, 1987, Martinez began serving a sentence of 25 years to life in prison.[4]

The Board of Parole Hearings[5] ("Board") twice denied Martinez admission to parole.  He received a four-year denial after the second hearing in February 2005.  After a

---

[1] "Hargraves" is also transcribed as "Hargrove" in the record.

[2] Unspecified section references are to the Penal Code.

[3] As the record does not include a transcript of the jury trial or an abstract of judgment, our primary source of facts about Martinez's criminal history is the probation report prepared for his sentencing in 1987.

[4] A psychological evaluation of Martinez from September 2008 recited that his sentence is 25 to life plus six consecutive years, but for purposes of this proceeding the People have admitted that the sentence is 25 to life.

[5] As of July 1, 2005, the Board of Parole Hearings replaced the Board of Prison Terms (§ 5075; Gov. Code, § 12838.4), though there remain a number of statutory references to the "Board of Prison Terms."  (E.g., §§ 2081.5, 2966, 3040, 3084, 4851, 5077, 5078, 5080, 5081.)

third parole consideration hearing on April 5, 2010 at the Correctional Training Facility ("CTF") in Soledad, the Board concluded in an oral decision that Martinez was "not suitable for parole and would pose an unreasonable risk of danger to society, or a threat to public safety if released from prison."  The Board denied Martinez a parole hearing for seven years.

Martinez challenged the latest decision by a petition for writ of habeas corpus.  On January 12, 2011, the superior court issued an order to show cause, and on July 28, 2011, after receiving a return and traverse, without conducting an evidentiary hearing, the court granted the petition and ordered the Board to conduct a further suitability hearing within 90 days.

The Warden of CTF filed a notice of appeal and this court issued a stay on September 28, 2011 to permit further consideration of the issues.  Three months later, on December 29, 2011, the California Supreme Court clarified the scope of judicial review of parole denials in *In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*).  Guided by that decision and other precedent, we will conclude that some evidence justified the parole denial and will reverse the order granting the habeas petition.

## II.  SCOPE OF REVIEW OF PAROLE BOARD DECISIONS

### A.  THE BOARD'S ROLE IN DETERMINING PAROLE SUITABILITY

The Board is charged by statute with conducting "parole consideration hearings" (§ 5075.1, subd. (a)) and, after a suitability hearing, the Board or a panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ."  (§ 3041, subd. (b).)

"[T]he core statutory determination entrusted to the Board and the Governor[, who is authorized by section 3041.2 to review the Board's decisions,] is whether the inmate poses a current threat to public safety," in other words, whether "the inmate is unsuitable

for parole because he or she currently is dangerous." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1191 (*Lawrence*); cf. *In re Shaputis* (2008) 44 Cal.4th 1241, 1254 (*Shaputis I*) ["the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety . . ."]; *Shaputis II, supra,* 53 Cal.4th 192, 220 ["The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety."].)  Under the Board's regulations, a "parole date should be denied if 'the prisoner will pose an unreasonable risk of danger to society if released from prison' (Cal. Code Regs., tit. 15, § 2402, subd. (a)) . . . ." (*In re Tripp* (2007) 150 Cal.App.4th 306, 311 (*Tripp*); fn. omitted.)[6]

"[A] parole suitability decision is an 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Shaputis II, supra,* 53 Cal.4th 192, 219, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*).)  The Board's decision "should be guided by a number of factors, some objective, identified in section 3041 and in the Board's regulations" as circumstances tending to show both unsuitability (Regs., § 2402(c)) and suitability (Regs., § 2402(d)).  (*Tripp, supra,* 150 Cal.App.4th 306, 312.)  "All relevant, reliable information available to the panel shall be considered in determining suitability for parole." (Regs., § 2402(b).)  "[W]hen evaluating whether an inmate continues to pose a threat to public safety, both the Board and the Governor must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*Lawrence, supra,* 44 Cal.4th 1181, 1219.)

California prison inmates subject to indeterminate sentences have a sufficient liberty interest in being released on parole to be entitled to a regularly scheduled parole hearing and a written statement of reasons for denying parole.  (*In re Sturm* (1974) 11

---

[6] References to "Regs." are to Title 15 of the California Code of Regulations.

Cal.3d 258, 270, 272; *Rosenkrantz, supra,* 29 Cal.4th 616, 655; § 3041.5, subd. (b)(2).) The Board's decision must do more than simply recite facts about the inmate that are unrelated to the question of his or her current dangerousness. When the connection is not apparent, the Board must articulate "a rational nexus between those facts and current dangerousness . . . ." (*Lawrence, supra,* 44 Cal.4th 1181, 1227.) An inmate is entitled to "an individualized consideration of all relevant factors." (*Rosenkrantz, supra,* 29 Cal.4th 616, 655; *Lawrence, supra,* at p. 1219.) However, "nothing in the requirement that a parole denial be accompanied by a 'statement of [ ] reasons' demands that the parole authority comprehensively marshal the evidentiary support for its reasons." (*Shaputis II, supra,* 53 Cal.4th 192, 214, fn. 11.)

### B. JUDICIAL REVIEW

When a trial court grants a habeas corpus petition based solely on documentary evidence without an evidentiary hearing, we "independently review the record" before the trial court. (*Rosenkrantz, supra,* 29 Cal.4th 616, 677; *In re DeLuna* (2005) 126 Cal.App.4th 585, 591; *In re Stevenson* (2013) 213 Cal.App.4th 841, 857.)

This does not mean that we independently review the underlying parole denial by the Board or the Governor. " 'Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board.' " (*Lawrence, supra,* 44 Cal.4th 1181, 1204, quoting *Rosenkrantz, supra,* 29 Cal.4th 616, 656; *Shaputis II, supra,* 53 Cal.4th 192, 214 ["When there is a reasonable basis to conclude that the most recent evidence of an inmate's current dangerousness is less trustworthy than other evidence, a reviewing court must defer to the parole authority's evaluation of the record."]; *Tripp, supra,* 150 Cal.App.4th 306, 318 ["When undisputed facts in an administrative record give rise to conflicting inferences and support equally reasonable interpretations, our appellate function requires us to defer to the fact-finder's interpretation."].) Credibility determinations are for the parole authority, not the court. (*Shaputis II, supra,* at p. 214.)

Courts must respect the broad executive discretion conferred on the Board and Governor. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 656-657.) " '[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' " (*Shaputis II, supra,* 53 Cal.4th 192, 210, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

*Rosenkrantz, supra,* 29 Cal.4th 616 rejected the contention that courts are confined to ensuring that procedural safeguards have been met. (*Id.* at pp. 657-658.) It determined that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but [] in conducting such a review, the court may inquire only whether *some evidence* . . . supports the decision to deny parole." (*Id.* at p. 658; our emphasis.) Parole decisions by the Governor are subject to the same limited review. (*Id.* at p. 667.)

*Rosenkrantz* stated, "As the United States Supreme Court explained in a related context: 'Requiring a modicum of evidence to support a decision [to deny parole] will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens. In a variety of contexts, the [United States Supreme] Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. [Citations.]' [Citation.] 'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is

*any* evidence in the record that could support the conclusion reached by [the Governor]. [Citations.]' ([Citation], italics added.)" (*Rosenkrantz, supra,* 29 Cal.4th at pp. 664-665, quoting *Superintendent v. Hill* (1985) 472 U.S. 445.) "[T]he 'some evidence' standard is extremely deferential and reasonably cannot be compared to the standard of review involved in undertaking an independent assessment of the merits or in considering whether substantial evidence supports the findings . . . ." (*Rosenkrantz, supra,* at p. 665.) The "some evidence" standard is "*more deferential*" than the familiar substantial evidence review. (*Shaputis II, supra,* 53 Cal.4th 192, 210.) *Lawrence, supra,* 44 Cal.4th 1181 established "when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id.* at p. 1212.)

Judicial review of a Board decision necessarily begins with the reasons given by the Board for its decision. (Cf. *Shaputis I, supra,* 44 Cal.4th 1241, 1255 [reviewing reasons given by Governor].) A court should conclude that some evidence supports a parole denial if the Board has accurately identified one or more factors as indicative of an inmate's current dangerousness and there is a modicum of evidence that each cited factor exists (e.g., *Shaputis I, supra,* 44 Cal.4th at pp. 1258-1261), unless it appears that the Board has arbitrarily disregarded compelling evidence of parole suitability. (Cf. *Lawrence, supra,* 44 Cal.4th 1181, 1223-1224, 1226; see *Shaputis II, supra,* 53 Cal.4th 192, 211 ["the Board or the Governor may not arbitrarily dismiss more recent evidence in favor of older records when assessing the inmate's current dangerousness."].)

A court cannot find a parole denial supported by some evidence if the denial relies entirely on factors that are either nonexistent (e.g., *Lawrence, supra,* at p. 1223 ["the Governor's conclusion that petitioner showed insufficient remorse is not supported by any evidence . . ."]) or irrelevant to dangerousness. (*Id.* at p. 1228 [court concluded that

the conviction offense was not a reliable predictor "36 years after commission of the offense and following 24 years of incarceration and demonstrated rehabilitation . . ."]; *In re DeLuna, supra,* 126 Cal.App.4th 585, 597 ["Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills."]; see *Tripp, supra,* 150 Cal.App.4th 306, 313 ["It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion."].)

## III. EVIDENCE OF PAROLE SUITABILITY

In reviewing the record of the parole hearing, our primary concern is whether the decision of the two-member panel accurately identified actual circumstances supporting its conclusion that Martinez is currently too dangerous to be scheduled for release from prison. As explained above, the scope of judicial review of the evidence before the Board is quite limited. We defer to the Board's resolution of factual conflicts and focus on the evidence to which the Board attached significance.

### A. PRECOMMITMENT CIRCUMSTANCES

Ray Martinez was born in March 1950. According to Martinez, his mother died when he was five years old and his father immediately remarried.[7] His stepmother had three children with his father and he craved the attention she gave them. He was the oldest son and had an older sister.

According to Martinez, at the age of nine, his grandfather saw him run away from a fight coming home from school. His grandfather whipped him with a belt, told him to

---

[7] The record does not reflect whether Martinez testified at trial, but the record contains his statements on various dates. Unless otherwise indicated, facts "according to Martinez" are what he said at the third parole consideration hearing on April 5, 2010, keeping in mind that the Board found him to have credibility problems.

never run from a fight, and taught him how to fight. The next day Martinez went to school and fought with the bully and "had been fighting and not running from fights ever since." His father was a drinker. His family moved repeatedly and Martinez learned that if he sounded tough in school, he did not have to fight as much. Martinez did not join a gang, but he associated with older gang members. He was attracted to their lifestyle and "wanted to be[] a tough low-rider." "That's how come I had that '54 Chevy that I was working on in the driveway. That's what made me to do what I did, because I wanted to be that tough guy. I put this persona of the tough guy to impress people, okay, to be a part of something. I tried to get along with the neighbors there, but they just wouldn't accept me." He thought "that the only way I could get respect was show how tough I was. I've gotten in a lot of fights, and I've gotten stabbed quite a few times. I've gotten guns pulled out on me" and felt his life would end.

At the parole hearing, the presiding commissioner asked why being threatened with guns did not change Martinez's behavior. Martinez answered, "that's the type of lifestyle that I was grew up with. That's the type of lifestyle that stimulated me. That's the kind of person that I had become, drug abuse, violence, going to places where people hung out that did the same thing." He believed that drugs had affected his mind. "I took just about every drug that was known to man. At that time, LSD, all the psychedelics that were out in the '70s, reds, Seconal. I took all of them. I experimented with all of those drugs, and I don't believe that my mind was right. I believe that my mind was defective, and to go with my defective mind, I had to have that temper . . . ." If he was not in control of a situation, he would lose control of his temper.

Martinez had ten misdemeanor convictions, four for driving under the influence (Veh. Code, § 23152) and was placed on formal probation four separate times. In August 1980, he was placed on formal probation after convictions for driving under the influence and battery (§ 242.) In January 1985, he was placed on formal probation for driving

under the influence.  During the parole hearing, the panel noted numerous arrests for subsequently dismissed charges between 1969 and 1985.[8]

## B.  THE LIFE CRIME

According to Martinez, he married and had three children.  The family lived four or five houses away from Michael and Betty Day and their four children.  Martinez got acquainted with the Day family at neighborhood barbeques, particularly the stepson Jamie.  Martinez bought marijuana from him.  Martinez did some things in his neighborhood that he was not proud of.  He drove across one neighbor's lawn to make a U-turn.  He got upset with another neighbor, challenged him to fight, and kicked his door when he ran inside.  He has come to realize that some neighbors were justifiably afraid of him.

Betty Day told a probation officer that her teenage children first got acquainted with Martinez in early 1983 and he sold them marijuana and other illegal drugs.  She did not meet Martinez until the summer of 1985.  He had terrorized the neighborhood for years.  He had driven on lawns, forced his way into her house, and demanded money while on her doorstep.

According to Martinez, he met Betty Day in late 1984 when Jamie invited him to a party at their house and they smoked marijuana and drank together.  Betty told him that

---

[8]  Although the panel did not provide the dates of his arrests at the parole hearing, according to a September 2008 psychological evaluation, Martinez was arrested in November 1969 for fighting (§ 415), assault (§ 240), and battery (§ 242), in February 1971 for assault with a deadly weapon (§ 245), in September 1973 for assault, fighting, and resisting a peace officer (§ 148), in December 1973 for resisting and assaulting a peace officer (§ 241), in October 1974 for inflicting corporal injury on a child (not a spouse as stated at the parole hearing) (§ 273d), in December 1979 for battery and shooting at an occupied dwelling (§ 246), and in May 1985 for possessing drugs in jail (§ 4573.6).

Michael was not living with them because he had left the state with a teenage girl. Martinez did not force entry into Betty's house.

According to Martinez, when his wife threatened to call the police if he did not stop growing marijuana in their house, he arranged with Betty and Jamie to store marijuana plants in their garage for a few days. In July 1985, Betty told him to move the plants out because she was planning to show and sell her house. She "got hysterical" when Martinez balked at moving the plants during the daylight, so he brought his truck and moved the plants out. He probably knocked some of her pictures off the wall in his haste. Jamie came to Martinez's house to say that his mother was upset about the damage. Martinez chased him away. He did not recall assaulting Jamie, although he admitted the assault at trial.

Betty told a probation officer that Martinez did not have her permission to store marijuana plants in her garage. During an argument about him removing them, he called her names and broke her possessions. When Jamie confronted Martinez in his home, Martinez physically assaulted him.

Ron Hargraves, the same age as Jamie, 17, began living with the Days in the summer of 1985, and he socialized at Martinez's house.

According to Martinez, Michael Day returned to finalize his divorce with Betty. On October 8, 1985, Martinez came to the Days' home in response to a telephone invitation from Hargraves. Jamie and Betty had Martinez sit in a chair in the middle of the kitchen, and Michael, whom he had not met before, emerged from a door, called him racial epithets, and threatened to hold him responsible and break his bones if anyone messed with Michael's family. Michael's face was red. Hargraves said that 17 Mexicans had ransacked the house. It was not true.

Later that day, the police responded to a report that Martinez and the caller's boyfriend had a shotgun and were going to beat up someone in the neighborhood. According to Martinez, nobody had a shotgun. It was his friend's .22 rifle. A shotgun

was found in Martinez's truck the next day.  Martinez told the police that Michael Day "had threatened to break his bones and 'get him.'"  Martinez was upset that the police were unable to act and told them that, if confronted, he would defend himself with any force needed.  When contacted by the police, Michael admitted that he had threatened to "take care" of Martinez if Martinez ever bothered his family again.  Michael and Betty told the police that Martinez had forced entry into their home several times during Michael's absence.

Shortly before noon on October 9, 1985, Martinez drove by as Betty and Michael were in their driveway.  They exchanged rude gestures and called each other names.  Martinez drove home.  According to Martinez, he drove past Michael's house on his way home from an auto parts store "and that's when the finger-pointing, you know, the flipping off and the name-calling started, and it just escalated into Mike being shot in front of the house there."

Michael, Betty, and Hargraves walked towards Martinez's residence and there was more yelling by Michael and Martinez.  According to Betty and Hargraves, Michael said he was unarmed and challenged Martinez to a fist-fight, while Martinez threatened to kill Michael.

Martinez told the police later the same day that they were carrying baseball bats.  Michael yelled at him to come out, saying he would take care of him "'right now.'"  Martinez told the panel that Betty and Hargraves were carrying two by two boards.

Martinez retrieved a 30-30 rifle from inside his house and went back outside.  When Michael saw Martinez with the rifle, he told Betty to run.  She hid behind a tree and Michael hid behind a parked van.  Martinez fired one shot through the van and hit Michael in the chest, fatally wounding him.

According to Martinez's version of the events, Michael was ten feet away.  Martinez's wife and two-year-old were inside their house.  He was afraid for them.  Michael told Hargraves to call the police and say that Martinez had a gun.  Michael

continued to advance on and yell at Martinez.  Martinez told the police that Michael yelled, "'You have a gun; I have a gun'" and reached towards the back of his waist.  According to Martinez, he grabbed the rifle because he thought Michael was armed.  He thought that Michael was drawing a gun, though he did not see a gun.  He thought Michael was going to come around the van and shoot him.

Hargraves returned to the Days' residence to call the police.  When he heard the sound of a shot, he took a shotgun from their residence, walked outside, and called Martinez out.  Martinez shot him in the leg.

Witnesses said that Martinez stood over Michael, yelling and taunting him.  Betty told a probation officer that Martinez said, "'I should blow your old lady's brains out.'"

When asked at the parole hearing about taunting, Martinez first said, "I wasn't doing that.  I think Betty Day was pretty mad and in her hatred, I think, she made that stuff up."  Martinez said he was not aware that Michael was dying and that he was trying to comfort him, telling him it was a shoulder wound, not a heart wound.  Martinez did raise his voice to yell to Betty because she was hysterical, but he was not taunting.  When asked to explain why someone heard him say he would blow Betty's brains out, Martinez said, "I was pretty upset at the time, too, and I did yell that out.  I did yell out because she was pretty much getting in my face, yelling and screaming, and in anger I did[,] I said that, yes."  Martinez insisted that he was not taunting Michael.

Martinez told the police where to find a loaded 30-30 rifle in his house and a loaded shotgun in his pick-up truck.  A sample of Martinez's blood contained phencyclidine.  Martinez does not recall using any drugs that day.  He habitually used PCP at the time and believes it was still in his system from smoking it earlier that week.  He acknowledged that it elicited a sense of paranoia.  What drugs did to Martinez was part of why he shot Michael.

## C. POST COMMITMENT FACTORS

During the parole consideration hearing, the panel noted that Martinez has "been disciplinary-free since 1994. He has received two [Rules Violation Reports], one for theft of State food, and·another for refusing to participate in education. He received a total of four 128-As,[9] the last was in 2000, had two failures to report to his assignment, one for non-issued property, and one for being slow to exit the chapel. He obtained his GED on 5/3/01."

The panel also noted that Martinez had received laudatory chronos from correctional officers, one in July 2005 for getting his job done, one in March 2006 for his conduct and demeanor. In cleaning his cell windows, he found homemade knives and turned them in to staff. His work reports have been from satisfactory to excellent. Martinez acknowledged that he had chosen not to get involved in vocational programming.

### 1. ADDICTION AND RECOVERY

According to Martinez, the first day he was in county jail after the shootings, he turned over his substance abuse problem to Jesus Christ. "I asked God to forgive me for the person that I had become. And I asked [H]im if he could do something with me, that I'm [H]is for the rest of my life." "You can't put it into words, the pain that I went through when I found out that Mike Day died that night. And I made a covenant with God that I would never pick up another joint, or any drugs at all." Martinez had been

---

**9** A written custodial counseling chrono (CDC Form 128-A) is the second level of prison staff response to minor inmate misconduct after verbal counseling. (Cal. Code Regs., tit. 15, § 3312(a)(2).) A counseling chrono is not regarded as discipline. (*In re Smith* (2003) 109 Cal.App.4th 489, 496, 501, 505, and fns. 3, 5.) "Disciplinary Free means without any finding of guilt of a disciplinary infraction filed on a CDC Form 115, Rule Violation Report, classified as either administrative or serious." (Cal. Code Regs., tit. 15, § 3000.)

raised as a Catholic and introduced to Jesus Christ at an early age. "And I knew about [H]im, but I didn't know [H]im." Now he is a Christian of no denomination. "The day that I accepted Christ into my life, I haven't even thought about taking drugs once."

Because Christ has freed him from addiction, Martinez felt no need for AA and NA programs in custody. Martinez had "attended the AA meetings, and it just went contrary to what the Scriptures say. And it went contrary to what my conscience was saying." AA has "a higher power, which could be any type of [g]od. They worship different [g]ods, and that's where the problem comes in" for him. Martinez had read books about addictions, but had not prepared book reports.

According to Martinez, he spends a lot of time in prison praying and reading the Bible. He practices with a singing praise team. He has prayer groups Tuesday and Thursday evenings, a Wednesday night service in the chapel, and a bible study group on Fridays. He has been working with drug addicts in prison and succeeded in getting one to break his addiction by accepting Jesus Christ as his Lord and Savior.

When asked about his relapse prevention plan, Martinez answered, "Well, first and foremost, I would continue my relationship with God, and spending time in prayer, spending time in his Word, spending time in meditation and attending church. The first thing that I would do is get familiar with the people in the church, and get just as much involved out there as I am in here. The second step for my relapse prevention would be to attend AA meeting groups . . . ." Also, "[a]void places and people that use drugs and alcohol. Anytime a stressful situation comes up, is to be able to recognize that it is stressful and contact" his support brothers, two men who were personally familiar with the stresses involved in re-entering society after prison. When later asked for clarification, he said, "the 12-Step programs that I'll be attending is based on Christ saving us from that addiction, not on the 12-Steps that the NA/AA do here."

When asked what would trigger him to use alcohol and drugs, he answered, "if I was to go back to where drugs are being used, if I was to start hanging out with people

that were using drugs, or if I was to get into that type of environment, I think that would be a trigger for me to going back to using drugs . . . ."

### 2. INSIGHT INTO THE LIFE CRIME

At the parole hearing, the presiding commissioner presented a version of the life crime from a "2004 December Calendar summary." Martinez said that the counselor must have been tired, "because he got the whole thing wrong."

When asked what happened, Martinez said that he had just met Michael Day recently. Michael had frightened him the day before. Martinez "just felt helpless, and I didn't know no other way to react, but react the way I did that day." He was not sure why Michael had threatened him. Michael might have thought that Martinez was having an affair with Betty, who had flirted with him. Betty wanted to get her husband back and might have used Martinez to show Michael that she needed him. "They pumped [the marijuana incident] up to something that really wasn't there," though the incident had occurred five months earlier.

When asked if he understood how the crime happened, Martinez answered, "It's because of the lifestyle that I was living. I was – I think the Commissioner last time pretty much said it, that my life was headed in a spiral direction downward, and that it was only a matter of time that something like this would have happened. I was a law-breaker. I was out of control, out of control. And if I were to have any kind of – [i]f I would have had just been raised different, I think." It started when Martinez's grandfather gave him a beating for running from a fight.

When asked how he felt about Betty Day, Martinez said, "It's been hard for me to forgive Mrs. Day for being·part of it. But I've come to the understanding now that it was because of my involvement in everything that took place that day. I feel sorry for Mrs. Day. I pray for Mrs. Day daily, and her family." Martinez acknowledged that he had exchanged curses and challenges to fight with Michael. "It was pretty much a mutual combat situation." When asked why he seemed to always blame Michael, Martinez said,

"It's hard for me to admit that I would do something like that. [¶] . . . [¶] It's hard to accept that I would deliberately take somebody's life like that. It's still hard for me."

When asked by the presiding commissioner why he did not call the police if he thought an armed man was advancing on him, Martinez said, "I didn't have a phone, for one. But it just, like I said, that I got to a point where I just lost control of my senses. I just lost control. I just got so mad that I couldn't, didn't know how to stop." Later at the hearing, when asked by his attorney what he would have done differently, Martinez said, "I would have called the police. I would have – I shouldn't have stopped. I should have kept going. I should have – I would have done a whole lot of things different that day." Martinez said he had given himself over to God 24 years ago and he was no longer the same person, "the kind of person that would pull the trigger, and kill somebody, and take somebody's life."

When asked what his weaknesses were, Martinez answered that he has a hard time saying no to people. When asked if there was anything else that he needed to work on, Martinez could not think of anything. The presiding commissioner gave an example that one of his own weaknesses was impatience with people. Martinez said that he had the same problem and also that it was hard for him to forgive people who kept doing the same thing repeatedly.

### D. THE BOARD'S DECISION

In denying parole for seven years, the panel commended Martinez for some of his conduct while incarcerated. "You haven't had a lot of serious misconduct while you've been incarcerated. You've done a pretty good job in following the rules of the institution. That's commendable." "Now to your credit, since you have been down, you have been disciplinary-free for a period of time. Your last 128 was in 2000. You've only received two rule violation reports. You did obtain your GED. You have demonstrated an ability to work. And it is very obvious that your belief structure is very important to you."

The panel found that "on balance, the circumstances that make you unsuitable, which we've already discussed with you, heavily outweigh these." The panel cited the following unsuitability factors. "The first consideration, which doesn't really weigh that heavily, was your commitment offense. It was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime is very trivial. We did notice with your prior criminality, that you did have an escalating pattern of criminality. You did have some unstable social history, and a pretty lengthy arrest history. You failed to profit from society's previous attempts to correct your criminality through adult probation. You did have some problems with drugs and alcohol, as you said, fights. You were a high school dropout."

There were a couple of primary reasons for denying parole. "[W]e talked a lot about insight. And this [p]anel could not find that you had any insight into this crime at all." While acknowledging responsibility for the life crime, Martinez "blamed everyone in the world for why this crime happened," the victim, the victim's wife, Martinez's grandfather, "except for the person that needed to be blamed the most." In talking about Martinez's childhood, he could not explain how it led to drugs and alcohol or the life crime. "You explained to me some things about how it led to fights, but you couldn't draw them to connect the dots into how all this stuff related." It sounded to the panel as though the victim "caused his own death." "[T]he first step is accepting responsibility, and we don't think you accept responsibility." "I don't know why you just didn't tell us why it happened."

The neighbors were afraid of Martinez, and "for you to come in here and tell us about how you were nothing but the victim here, was certainly not taking responsibility for your actions." Martinez explained that he did not call the police because he did not have a phone, but when asked by his attorney what he would do differently, he said he would call the police.

The panel "didn't put a whole lot of weight in the psychological evaluation," because it seemed self-contradictory.[10]

"You blamed the 17-year-old again for the reason why he ended up being shot, that he came down." The panel did not find Martinez's testimony to be very credible. "We don't feel that you understand or you minimize your actions in this life crime."

"Another very troubling factor" was Martinez's drug addiction, which was a "serious problem when you were on the streets. And frankly, I don't see what you've done anything long term, to deal with your addiction. Just saying no, I'm not a firm believer in it." Martinez said that due to his own religious views, he did not believe in the AA approach. "But you've done nothing as far as any kind of self-help that has been long term. When we talked about what you were going to do, you sat, and even in your clos[ing], you told us how basically you have no plan. You're just going to trust God is going to keep you from using, going back to using. I think there needs to be a little bit more, and you haven't done the work. I don't know whether you're stubborn, because I think the last [p]anel told you to do the same thing. You know, the same thing with the vocational programming. You know, I don't know whether you're stubborn and not wanting to do what the Board makes their recommendations for you to do, or whether you think, maybe you think you know better than the [p]anel. But you're not doing what's being recommended for you."

"[Y]ou need to dig a little deeper into you. You need to spend more time discovering who you are, and you need to spend a little more time discovering your addictions, and how you're going to deal with your addictions. This [p]anel didn't feel that you've come to any conclusions on that, and it is a little bit disturbing."

---

[10] We do not summarize the panel's discussion of the psychological evaluation at the hearing because the panel ultimately gave it little weight.

A deputy commissioner explained why she concurred in the denial. "I was troubled, very troubled when you said you accepted God your first night in jail for the instant offense, and that, quote, 'The pain I went through when I found out Mike Day died that night.' Anytime you pick up a gun that is loaded, there is a very real possibility that somebody is going to die. And I think you were old enough at 35 and had been around enough, long enough to understand that. I didn't hear from you anything, any actions that you have taken to make amends for your actions that day. I did hear the apology letter. I think that was heartfelt, but I didn't see any overt actions that you have taken to make amends for your actions."

"The other thing that was really troubling to me was there were a group of people who described themselves as your neighbors. And they drew a picture of you that was not very flattering at all, describing you as being intimidating, the neighborhood bully, someone who was involved with drugs, who got involved with others with drugs, and what have you."

Her final comment was that, while his belief structure was important to him and he appeared to find "a great deal of satisfaction in proselytizing . . . you have to recognize that you miss out on so many other of life's activities if you only focus in one direction, whatever that direction is. And be careful that you don't fall into the trap of using your religious beliefs as a crutch [] and a substitute for other life experiences. Faith is a very important foundation of the house of life, but it isn't the walls and it isn't the roof. It is the strong foundation."

## IV. EVIDENCE OF MARTINEZ'S CURRENT DANGEROUSNESS

In *Shaputis I, supra,* 44 Cal.4th 1241, the Governor reversed the Board's grant of parole on two grounds, "(1) the crime was especially aggravated because it involved some premeditation, and (2) petitioner had not fully accepted responsibility for, and lacked sufficient insight concerning, his conduct toward the victim." (*Id.* at p. 1253.) The Supreme Court found that some evidence supported each ground. "[A]lthough

petitioner has stated that his conduct was 'wrong,' and he feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense." (*Id.* at p. 1260.) He still claimed that the shooting of his wife "was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming' . . ." was some evidence of dangerousness. (*Ibid.*; fn. omitted.)

In *Shaputis II, supra,* 53 Cal.4th 192, the Supreme Court offered "some general guidance to the Courts of Appeal on inmates' lack of insight as a parole unsuitability factor," as "lack of insight has played an increasingly prominent part in parole decisions and the ensuing habeas corpus proceedings." (*Id.* at p. 200.) "Consideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.'" (*Shaputis II, supra,* at p. 218.)

In this case the trial court relied on this court's then-recent decision in *In re Ryner* (2011) 196 Cal.App.4th 533 for the proposition that "'[e]vidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime.'" (*Id.* at p. 548, fn. omitted.) Martinez relies on the same passage in his brief. This court has recognized that "[t]he majority of the Supreme Court did not embrace *Ryner*'s reasoning or the limitation suggested." (*In re Stevenson, supra,* 213 Cal.App.4th 841, 867; fn. omitted.)

In our case, the superior court stated that "[a] close examination of the record reveals that the Board's conclusion that Petitioner lacks insight is based upon little more

than the fact that Petitioner's answers to what amounted to pointed cross-examination by the presiding commissioner were muddled.  The presiding commissioner spent a great deal of time focusing on Petitioner's attempt to explain his rough childhood before turning Petitioner's answers around with argumentative questions implying that he was not 'accepting responsibility' for the murder.  Yet the record reveals that Petitioner, when allowed by the Board, readily accepted responsibility for his actions."  Also, "Petitioner exhibited an understanding of his addiction problems and his involvement in support groups, although not AA or NA as the Board seemed to endorse."

From reading a cold transcript of the parole hearing, we are unable to ascertain how readily or sincerely Martinez accepted responsibility for his actions.  Instead, we find more than a modicum of evidence supporting the Board's conclusion that Martinez sought to minimize his role in shooting Michael Day to death.

When asked to explain why he shot Michael, Martinez began by emphasizing how afraid of Michael he was on October 9, 1985, due to Michael's threats the day before.  He attributed their confrontation to his disagreement with Betty Day "at least five months prior to his coming back" about damaging her property while removing marijuana plants.  Martinez speculated that Betty was using Martinez to get her husband back and had inflated the seriousness of their disagreement.  Martinez later admitted he still had a hard time forgiving her for her role in the shooting and he still found it hard to admit his own responsibility.

Martinez's view of the life crime at the parole hearing at the age of 60 appears to have been substantially the same as it was on the day of the shooting, when he was 35.  He portrayed himself as being unable to react to threats by Michael Day, provoked by Betty, in any way other than the physical force that Martinez's grandfather had shown when he beat him for running from a fight at the age of nine.  Despite having 25 years to accept that he shot an unarmed man, Martinez persisted in asserting his belief at the time that Michael was armed, even though the jury apparently rejected his statement.

Martinez's motivations on the day of the crime and his perception of the events cannot be expected to change, but he can be expected to show some understanding of why he was governed by those motivations and inclined to those perceptions and what was dangerous about them.

The Board did not question the sincerity of Martinez's religious beliefs, but it did suggest that he has been so preoccupied with religious studies and efforts in prison that he had not yet thought through why he was so prone to physical confrontations and why he had armed himself and was capable of shooting someone who was challenging him to a fight in broad daylight.

In *In re Morganti* (2012) 204 Cal.App.4th 904 (*Morganti*), in denying parole, the Board expressed concern about Christopher Morganti's faith alone being his relapse prevention plan and recommended that he get more involved in AA and NA programs. (*Id.* at p. 912.)  The appellate court found that the Board's concern was based on "the Board's mischaracterizations of Morganti's statements to the Board" and to a doctor who had submitted a risk assessment of Morganti.  (*Id.* at p. 918.)  "[T]he Board's conclusion that Morganti relies *only* on his religion to stay away from drugs is unsupported by any evidence." (*Id.* at p. 922.)  The appellate court noted that Morganti "has participated in AA and NA for more than 15 years.  Not once did he indicate a desire to stop doing so, not once a belief that the programs were ineffectual. . . . So far as the record shows, Morganti has never stated a belief that the teachings of the church conflict in any way with those of AA and NA." (*Id.* at pp. 918-919.)  The appellate court credited Morganti's statements that he was not just relying on the Bible, but on AA and NA, and he was paying for years of drug abuse with degenerating health at age 59.  (*Id.* at p. 921.)

In contrast, there was some evidence that Martinez's faith is his primary relapse prevention plan.  We do not question that firm religious convictions and immersion in church activities, and not just incarceration, have facilitated Martinez's sobriety in prison. In *Morganti*, the appellate court observed that Morganti recognized in "candid detail" in a

hand-written statement that his drug consumption was to avoid the pain of a divorce, separation from his children, and his father's lengthy battle with cancer. (*Id.* at p. 924.) In contrast, Martinez did not reveal a similar level of self-understanding as to why his drug consumption was so out of control or how he was able to transform himself overnight. He indicated that if he were released, being around people using drugs might trigger him using them. His plan to avoid this temptation was primarily to continue his immersion in religion and avoid such people. The Board's concern about the possibility of Martinez relapsing was more justified than was the Board's concern in the case of *Morganti.* (*Id.* at pp. 921, 927-928; cf. *In re Smith* (2003) 114 Cal.App.4th 343, 371-372 [Governor's concern about relapse unsupported by evidence].)

Martinez's statements to the Board provided some evidence that he needed to work on understanding why he abused drugs and became a violence-prone individual. Martinez pointed to external aspects of his childhood environment and upbringing, but he did not explain what about his nature inclined him to physical violence.

"The Board and the Governor may consider 'the inmate's understanding of the crime and the reasons it occurred, or the inmate's insight into other aspects of his or her personal history relating to future criminality.'" (*In re Stevenson, supra,* 213 Cal.App.4th 841, 865, quoting *Shaputis II, supra,* 53 Cal.4th 192, 220.)

According to Martinez, when he was incarcerated, he simultaneously entered a new spiritual world and left behind the person he had become. Martinez presented evidence that by immersing himself in religion, he has turned his back on the out-of-control, violence-prone person he once was. While this is commendable, there was some evidence that Martinez has paid insufficient attention to how he became that person and over 25 years has developed little understanding of his own responsibility for a first degree murder. It is reasonable that the Board would be more confident about the evidence that Martinez had changed for the better if he were able to explain how he became a murderer and how he was capable of such a rapid and dramatic change. We

conclude there was some evidence that Martinez has a potentially dangerous lack of insight into what happened on October 9, 1985.

## V.  DISPOSITION

The order granting a writ of habeas corpus is reversed.  The trial court is directed to deny the petition.

_____

Grover, J.

**WE CONCUR:**

_____

Premo, Acting P.J.

_____

Bamattre-Manoukian, J.